IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TITHONUS PARTNERS II, LP,<br><br>*Plaintiff,*<br><br>v.<br><br>CHICAGO TITLE INSURANCE COMPANY,<br><br>*Defendant.* | Civil Action No. 2:20-cv-952<br><br>Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff, Tithonus Partners II, LP ("Tithonus Partners"), sued Defendant, Chicago Title Insurance Company ("Chicago Title"), alleging that it breached a title insurance policy by failing to indemnify Tithonus Partners in a related action concerning a land dispute, and that Chicago Title's refusal to do so was in violation of Pennsylvania's insurance bad faith statute, 42 Pa. C.S. § 8371. (ECF No. 21). The parties filed cross-motions for summary judgment. (ECF Nos. 27 and 28). For the following reasons, the Court holds that summary judgment is warranted in Chicago Title's favor because, as a matter of law, no coverage was owed under the insurance agreement.

### I.   FACTUAL BACKGROUND

In 2012, Tithonus Partners, a limited partnership, was formed with Tithonus GP II, LLC ("Tithonus GP") as the general partner and Hawthorne Assisted Living Partners II, LP, Richard Irwin and Loriann Putzier as the limited partners. Tithonus Partners then created three separate limited partnerships so that each limited partnership could acquire an assisted living facility.

1

One of these partnerships was Tithonus Tyrone, LP ("Tithonus Tyrone"), which took title to an assisted living facility in Tyrone, Pennsylvania known as Colonial Courtyard at Tyrone. 0.1% of Tithonus Tyrone was owned by one general partner, Tithonus GP, and 99.9% was owned by one limited partner, Tithonus Partners. (ECF No. 33, ¶¶ 2-3, 5-7, 9; ECF No. 39, ¶¶ 2-3, 5-7, 9; ECF No. 30, ¶¶ 1-4, 18-19; ECF No. 35, ¶ 1-4, 18-19).

In June 2012, Tithonus Tyrone purchased three adjoining parcels of property totaling approximately 60 acres in the Tyrone Borough of Blair County, Pennsylvania. The assisted living facility was located on a portion of the insured land, and the rest of the insured land was vacant. (ECF No. 33, ¶¶ 11, 14; ECF No. 39, ¶¶ 11, 14). Tithonus Tyrone also obtained a policy of title insurance (Policy Number 120181PIT-B) from Chicago Title, dated July 2, 2012, in the amount of $3,077,000.00 (the "Policy"). (ECF No. 21-1). "Schedule A" to the Policy defined the "Insured" as "Tithonus Tyrone, LP, a Pennsylvania limited partnership." (ECF No. 21-1, p. 3). The "Definition of Terms" further identified the "Insured" as:

> (i) The term "Insured" also includes
> (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;
> (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
> (C) successors to an Insured by conversion to another kind of Entity;
> (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
> > (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named insured,
> > (2) if the grantee wholly owns the named Insured;
> > (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured; provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
> > (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

>   (ii)   With regard to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.

(ECF No. 21-1, p. 13, § 1(d)).[1] The Policy insured "against loss or damage" for "Covered Risks" subject to certain "Exclusions from Coverage," "Exceptions from Coverage Contained in Schedule B" and the "Conditions" set forth in the policy. (ECF No. 21-1, p. 2) (capitalization removed). It further stated that the "law of the jurisdiction where the Land is located" shall be applied to "interpret and enforce the terms of this policy." (ECF No. 21-1, p. 17).

In 2013, Tithonus Tyrone separated the 1-2 acre lot on which the assisted living facility sat (Lot 4) for refinancing with the U.S. Department of Housing and Urban Development ("HUD"). The purpose of the subdivision was to facilitate refinancing through HUD of Tithonus Tyrone's mortgage loan and to finance some capital improvements on the assisted living facility. To complete the financing, it was necessary for Tithonus Tyrone to convey the vacant land. Accordingly, Tithonus Tyrone retained title to Lot 4 and the assisted living facility, and it conveyed the 58 acres of vacant property to Tithonus Partners through a deed ("First Deed") dated April 24, 2014.[2] (ECF No. 21-2; ECF No. 30, ¶¶ 5, 17; ECF No. 35 ¶¶ 5, 17; ECF No. 33, ¶¶ 19-22; ECF No. 39, ¶¶ 19-22). The First Deed states, in relevant part:

>   THIS INDENTURE is made as of the 23rd day of April, 2014, between TITHONUS TYRONE, LP, a Pennsylvania limited partnership ("Grantor") and TITHONUS PARTNERS II, LP, a Pennsylvania limited partnership ("Grantee").
>   WITNESSETH, that Grantor, as a distribution to Grantee with a value of Twenty-Two Thousand Five Hundred Dollars ($22,500), the receipt and legal sufficiency of which are hereby acknowledged, does hereby grant, bargain, sell,

---

[1] The Policy fails to include a further definition of the phrase "successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization," set forth in § 1(d)(i)(B), or to further define the term "wholly-owns" set forth in § 1(d)(i)(D)(2). (ECF No. 30, ¶¶ 15, 16; ECF No. 35, ¶¶ 15, 16).

[2] Tithonus Tyrone is now owned by a third-party. (ECF No. 33, ¶¶ 37, 38, 41; ECF No. 39, ¶¶ 37, 38, 41).

> release, convey and confirm, unto Grantee, and Grantee's successors and assigns, all of Grantor's interest in and property described in Exhibit A, attached hereto.
>
> UNDER AND SUBJECT TO any and all easements, rights of way, leases, licenses, restrictions, reservations and grants (including, but not limited to reservations and grants of mining, coal, gas and oil rights, if any) as described in Title Insurance Policy No. 120181PIT-B, dated July 2, 2012, issued to Grantor by Chicago Title Insurance Company.
>
> TOGETHER with all singular ways, waters, water courses, rights, liberties, privileges, hereditaments and appurtenances whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof and also all the estate, right, title, interest, use, trust, property, possession, claim and demand whatsoever of Grantor, in law, equity, or otherwise, howsoever, of, in, to or out of the same.
>
> TO HAVE AND TO HOLD the same to and for the use of the said Grantee, and the Grantee's successors and assigns, FOREVER.
>
> AND THE GRANTOR hereby covenants and agrees that Grantor will warrant SPECIALLY the property hereby conveyed.

(ECF No. 21-2, p. 2). Tithonus Partners did not obtain a new owner's policy of title insurance on the vacant land. (ECF No. 33, ¶ 25; ECF No. 39, ¶ 25). It did not speak to anyone at Chicago Title about obtaining a new owner's policy of title insurance on the vacant land identifying it as the name insured. Chicago Title did not represent to Tithonus Partners that it would be covered by the Policy issued to Tithonus Tyrone. (ECF No. 33, ¶¶ 25-28; ECF No. 39, ¶¶ 25-28).

In 2017, Tithonus Partners subdivided the 58 acres of vacant land to facilitate the sale of a small portion, Lot 5. Then, by deed dated January 30, 2018 ("Second Deed"), Lot 5 was sold by Tithonus Partners to Port Pizza, LLC ("Port Pizza"). (ECF No. 21-4; ECF No. 30, ¶¶ 23-24; ECF No. 35, ¶¶ 23-24; ECF No. 33, ¶¶ 34-35; ECF No. 39, ¶¶ 34-35).

On or about January 21, 2020, Port Pizza commenced an action against Tithonus Partners and four other defendants at Docket No. 2020-CN-239 in the Court of Common Pleas of Blair County, Pennsylvania, alleging that a portion of the conveyed property had not been owned by Tithonus Partners. Tithonus Partners then submitted a claim to Chicago Title on February 21, 2020, requesting that it fully indemnify, defend and/or resolve issues pertaining to the allegations

in the Port Pizza litigation. It claimed it was an "'Insured' under the 2012 Policy through a Deed of distribution dated April 23, 2014 delivered by Tithonus Tyrone, LP."[3] (ECF No. 34, p. 270; ECF No. 33, ¶¶ 43-44; ECF No. 39, ¶¶ 43-44).

Chicago Title determined that Tithonus Partners did not qualify for coverage as an "insured" under the Policy, and it denied the claim by March 13, 2020 letter ("First Denial Letter"). Its explanation for the denial of coverage was:

> The Claimant is not an "insured" as the term is defined by the Policy. The Claimant is not the named insured identified in Schedule A of the Policy. The Claimant is not a successor to the Named Insured because the Claimant acquired the Property by grant. Finally, the Claimant is not a grantee of an insured under a deed delivered without payment because Claimant paid $22,500 to the Named Insured in exchange for the Property. As such, the Claimant does not qualify as an insured as defined under the Policy.

(ECF No. 21-5, p. 3).

By March 25, 2020 letter, Tithonus Partners requested reconsideration arguing that it: (1) qualified as an insured under § 1(d)(i)(B) of the Policy because it was a successor to Tithonus Tyrone's interests in the property by distribution; and/or it (2) qualified as an insured under § 1(d)(i)(D)(2) of the Policy because it never paid any consideration to Tithonus Tyrone for the distribution of the property and because Tithonus Partners wholly owned Tithonus Tyrone at the time of the grant.[4] (ECF No. 34, pp. 272-73). By April 10, 2020 letter, Chicago Title once again denied Tithonus Partners's claim, because it not an "Insured" under the Policy. (ECF No. 21-6). As to

---

[3] At time of its claim, Tithonus Partners and Tithonus Tyrone had no common ownership. (ECF No. 33, ¶ 45; ECF No. 39, ¶ 45). Furthermore, Tithonus Tyrone is not a party to the Port Pizza litigation, and Tithonus Partners has not demanded that Tithonus Tyrone defend and indemnify Tithonus Partners in the litigation. (ECF No. 33, ¶ 47; ECF No. 39, ¶¶ 47, 48).

[4] Tithonus Partners was actually a 99.9% owner of Tithonus Tyrone at the time of the grant.

5

Tithonus Partners's first argument regarding coverage under § 1(d)(i)(B) of the Policy, Chicago Title responded:

> A distribution of the nature mentioned in the Policy occurs as part of a non-voluntary transfer by operation of law resulting from some acts such as a dissolution or merger. In this instance, there was no dissolution of the Named Insured, and the Named Insured did not merge with the Claimant. In this circumstance, the transfer of the deed evidences an agreement between the Named Insured and the Claimant to voluntarily convey the Property rather than being merely a confirmatory act memorializing a transfer that had already occurred by operation of law.

(ECF No. 21-6, p. 3) (internal citations omitted). As to Tithonus Partners's second argument regarding coverage under § 1(d)(i)(D)(2) of the Policy, Chicago Title responded:

> [T]he Agreement of Limited Partnership for the Named Insured states that the Named Insured is a limited partnership with [Tithonus] GP II, LLC ("[Tithonus] GP") as the general partner, and the Claimant as the limited partner. The Claimant's Agreement of Limited Partnership states that the Claimant is a limited partnership with [Tithonus] GP as the general partner, and Hawthorne Assisted Living Partners II, LP, Richard Irwin, and Loriann Putzier as limited partners. As such, it does not appear that the Named Insured is wholly owned by the Claimant, and, as a result, the Claimant does not qualify as an insured as defined under the Policy.

(ECF No. 21-6, p. 3) (citations omitted).

On May 28, 2020, Tithonus Partners commenced this action in the Civil Division of the Court of Common Pleas of Allegheny County, Pennsylvania. (ECF No. 1). Chicago Title removed the case to this Court on June 26, 2020, on the basis of diversity jurisdiction, *see* 28 U.S.C. §§ 1332, 1441. (ECF No. 1). Both parties have sought summary judgment in their favor as to both counts. Chicago Title argues that, as a matter of law, it correctly (Count I) and reasonably (Count II) denied coverage under the Policy and refused to defend Tithonus Partners in the Port Pizza litigation. (ECF No. 32). In contrast, Tithonus Partners argues that summary judgment should be granted in its favor because, as a matter of law, it qualified as an "Insured"

6

under the Policy (Count I), and that Chicago Title failed to conduct a reasonable investigation prior to denying its claim (Count II). (ECF Nos. 28, 29).

## II.   STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

"When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining for each side whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2016)). Under the same rule, if upon review of a party's motion for summary judgment, the court, viewing the evidence in the light most favorable to the nonmoving party, enters summary judgment for the moving party, the court may properly declare the opposing party's cross-motion for summary judgment as moot. *Beenick v. LeFebvre*, 684 F. App'x 200, 205-06 (3d Cir. 2017).

### III. ANALYSIS

The threshold issue is whether Tithonus Partners is an "Insured" party under the Policy issued by Chicago Title to Tithonus Tyrone in 2012. After a probing examination of the relevant contractual language, the Court holds that Tithonus Partners is not an "Insured." As such, no coverage is owed. Because it is not an "Insured" and is not entitled to coverage, Tithonus Partners's bad faith claim also fails.

#### A. COUNT I – BREACH OF CONTRACT

The parties agree that Pennsylvania law governs the Court's analysis of the Policy language. Tithonus Partners bears the burden of proving facts that bring its claim at Count I within the Policy's grant of coverage. If it meets that burden, then Chicago Title bears the burden of demonstrating that a policy exclusion excuses it from providing coverage. *State Farm Fire & Cas. Co. v. Est. of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co., Inc. v. Aetna Cas. And Sur. Co.*, 98 F.3d 1440, 1446 (3d. Cir. 1996) (applying Pennsylvania law)).

Courts generally enforce the plain language of an insurance policy. *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 901 (3d Cir. 1997) ("If . . . the terms of the policy are clear and unambiguous, the general rule in Pennsylvania is to give effect to the plain language of the agreement." (citations omitted)). "Straightforward language in an insurance policy should be given its natural meaning." *Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 162 (3d Cir. 2002). "Under Pennsylvania law, an insurance contract is ambiguous where it: '(1) is reasonably susceptible to different constructions, (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning.'" *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011) (quoting *Lawson*, 301 F.3d at 163). Courts should not, however, "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Constr. Co. v.*

8

*Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *see also Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998) (applying Pennsylvania law). Any ambiguity in policy language should be interpreted against the insurer. *McMillan v. State Mut. Life Assurance Co.*, 922 F.2d 1073, 1075 (3d Cir. 1990). Failing to define a coverage term does not mean that it is ambiguous. *Cap. Flip, LLC v. Am. Modern Select Ins. Co.*, 416 F. Supp. 3d 435, 439 (W.D. Pa. 2019) (citing *Heebner v. Nationwide Ins. Enterprise*, 818 F. Supp. 2d 853, 857 (E.D. Pa. 2011)). Parties' disagreement on the proper construction of a provision does not render it ambiguous. *Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 562 (Pa. Super. 2006). Whether a contract is ambiguous is a question of law for the court to decide. *Id.* at 561-62; *Thomas Rigging & Constr. Co., Inc. v. Contraves, Inc.*, 798 A.2d 753, 756 (Pa. Super. 2002); *see also Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 391 (3d Cir. 2012) (under Pennsylvania law, the interpretation of an insurance contract is a matter of law).

1. **Tithonus Partners is not a "successor" to Tithonus Tyrone pursuant to § 1(d)(i)(B) of the Policy and, therefore, it is not an "Insured" under that clause of the Policy.**

Section 1(d)(i)(B) of the Policy provides:

The term "Insured" also includes (B) successors to an Insured by dissolution, merger, consolidation, ***distribution***, or reorganization[.]

(ECF No. 21-1, p. 13) (emphasis added). Tithonus Partners contends that it is a successor to Tithonus Tyrone by distribution. Tithonus Partners concedes that there was not a dissolution, merger, consolidation, or reorganization of Tithonus Tyrone. According to Tithonus Partners, the First Deed conveying the Property to it from Tithonus Tyrone expressly labels the conveyance as "a distribution to Grantee." (ECF No. 21-2, p. 2). It takes the position that "by the plain and express language of the First Deed, Tithonus Partners is a successor to the Property by distribution to Tithonus Tyrone." (ECF No. 29, p. 15). Thus, because it qualifies

9

as a "successor" to Tithonus Tyrone, Tithonus Partners argues that it is clearly an "Insured" under the plain language of the Policy. (ECF No. 42, pp. 5-6; ECF No. 47, pp. 2-3).

In contrast, Chicago Title argues that Tithonus Partners has not shown that it is actually Tithonus Tyrone's successor. It contrasts the language of § 1(d)(i)(A), which references "successors to the Title of the Insured by operation of law," with that of § 1(d)(i)(B), which references "successors to an Insured." (ECF No. 36, p. 10). Chicago Title argues that this difference is significant and provides coverage in distinct situations. Citing to Black's Law Dictionary, it argues that being a "successor" to an entity—rather than merely to the title—"implies that the predecessor entity has ceased to exist and has been replaced for all purposes by the successor entity." (ECF No. 36, p. 10). Chicago Title contends that it is undisputed that Tithonus Tyrone still exists and that it operates an assisted living facility on the portion of the land it kept (Lot 4) from which it generates income. And, Tithonus Tyrone's portion of the land remains insured under the Policy. (ECF No. 32, pp. 10-11). Chicago Title also argues that "[e]very owner of real estate who takes title by grant has succeeded to its predecessor's title in that limited sense, but this does not make the current owner the 'successor' to the prior owner. There is a difference under the Policy between a 'successor to the title' and a 'successor to the Insured.'" (ECF No. 48, pp. 3-4).

The Court holds that Tithonus Partners is not a successor to Tithonus Tyrone pursuant to § 1(d)(i)(B) of the Policy. In reaching its holding, the Court first examined the specific language of the clause at issue—which provides coverage to "successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization." It is significant, as Chicago Title argued, that § 1(d)(i)(B) specifically references successors "to an Insured" rather than "to the Title of the Insured" referenced at § 1(d)(i)(A). The Court may not ignore the difference in language—it

10

must give it full effect that recognizes and actualizes the difference in terminology used in each clause. The fact that the phrase "successors *to an Insured*" is modified by a list of specific events highlights that § 1(d)(i)(B) contemplates an existential alteration, if not extinction, of the original "Insured."

The Court's reading of § 1(d)(i)(B) is bolstered by the interpretive canon[5] *noscitur a sociis*, which is "literally translated as 'it is known by its associates.'" *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010) (citation omitted). The canon "counsels lawyers reading statutes that 'a word may be known by the company it keeps.'" *Id.* (citation omitted). Thus, "words grouped in a list should be given related meaning." *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006) (citations omitted). Further, "[t]hat several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). Section 1(d)(i)(B) includes "distribution" in a series of words that each refer to an event whereby a business entity is structurally changed (i.e., "merger," "consolidation," "reorganization") or eliminated (i.e., "dissolution"). "Distribution," as used in §1(d)(i)(B), must be read consistently with its companions. Thus, it must refer to the liquidation of an entity's assets, rather than partnership distributions made in the ordinary course of business. This reading is internally consistent with the provisions of § 1(d)(i)(B), and it also recognizes the distinction between "successors to the Title of the Insured" and "successors to an Insured." Tithonus Partners is not an "Insured" under § 1(d)(i)(B).

---

[5] *See, e.g., Viera*, 642 F.3d at 418-19 (applying a canon of statutory interpretation to interpret language in an insurance contract); *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 365-66 (3d Cir. 2004) (same).

**2. Tithonus Partners is not an "Insured" under § 1(d)(i)(D)(2) of the Policy.**

Tithonus Partners also claims coverage as an "Insured" under § 1(d)(i)(D)(2) of the Policy. That subclause defines an "Insured" as:

> (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
> * * *
> (2) if the grantee wholly owns the named Insured[.]

(ECF No. 21-1, p. 13). Tithonus Partners argues that the record is clear that it did not pay consideration for the property. (ECF No. 38, pp. 8-9). It contends that the original named "Insured," Tithonus Tyrone, should be deemed "wholly owned" by Tithonus Partners because it owned 99.9% of Tithonus Tyrone at the time of the transfer of property, and the remaining 0.1% was owned by Tithonus Partners's general partner, Tithonus GP II, LLC, which was also a general partner of Tithonus Tyrone. Tithonus Partners argues that it is impossible for a limited partnership to be 100% owned by one single entity in Pennsylvania, as it must have a general partner and a limited partner. (ECF No. 38, pp. 10-12; ECF No. 47, pp. 3-5). Tithonus Partners submits that "[t]his is as close as a Pennsylvania limited partnership can be to 'wholly owned,'" such that it effectively "wholly owned" Tithonus Tyrone at the time of the conveyance and, therefore, it was insured under § 1(d)(i)(D)(2) of the Policy. (ECF No. 47, p. 5).

Chicago Title argues that Tithonus Partners cannot be classified as an "Insured" as the grantee of Tithonus Tyrone because, even assuming no consideration was paid, it failed to meet the test set forth in § 1(d)(i)(D)(2) of the Policy—"if the grantee wholly owns the named Insured." (ECF No. 32, pp. 15-17). According to Chicago Title, when the claim for coverage was made, Tithonus Partners owned 0% of Tithonus Tyrone, and Tithonus Partners has admitted as much. (ECF No. 48, p. 6). Tithonus Partners is a limited partnership with four partners, none of whom were ever Tithonus Tyrone. When the original Policy was sought in 2012, Tithonus

Tyrone was a limited partnership with Tithonus GP II, LLC as the general partner and Tithonus Partners as the limited partner. (ECF No. 32, pp. 15-16). It submits that "[a] conveyance from a parent corporation to a wholly owned subsidiary would qualify; but a conveyance by a partnership to only one of its two partners, as occurred here, would not." (ECF No. 32, p. 16).

The Court will first address whether to read the provisions of this subclause as referring to ownership at the time of the conveyance or at the time the insurance claim is made. Chicago Title takes the position that because § 1(d)(i)(D)(2) uses the present tense, the critical point is the ownership of the named Insured at the time the claim is made, rather than the time of conveyance. If, as Chicago Title argues, the critical date is the time the claim was made, then there is no question that Tithonus Partners is not an "Insured" because it is undisputed that, at the time, it did not own any part of Tithonus Tyrone.

The Court holds, however, that the proper point of reference is the time of the grant. The focal point of § 1(d)(i)(D) is the grant of the insured Title pursuant to "a deed delivered without payment of actual valuable consideration." This clause looks to the time of the grant. And the relevant subclause—"if the grantee wholly owns the named Insured," § 1(d)(i)(D)(2)—clearly refers to the specific event of the conveyance effectuated by "a deed *delivered* without payment," § 1(d)(i)(D) (emphasis added). Moreover, the reading espoused by Chicago Title, focusing on the time the claim was made, would allow related companies (as Tithonus Partners and Tithonus Tyrone are here) to recalibrate ownership structures prior to making a claim when, at the time of the conveyance, the "wholly owned" provision of §1(d)(i)(D) was clearly inapplicable. This would not be a sound result and is not supported by the terms of the contract. As such, the Court will, as urged by Tithonus Partners, look to the time of the conveyance.

The Court holds that there is no genuine issue of material fact that Tithonus Partners made no "payment of actual valuable consideration" in return for the conveyance. The critical issue, therefore, is whether Tithonus Tyrone was "wholly owned" by Tithonus Partners. Notwithstanding the fact that, as Tithonus Partners argues, it owned *almost* all of Tithonus Tyrone, 99.9%, the Court cannot hold that it *wholly* owned Tithonus Tyrone. The contract clearly and unambiguously calls for whole ownership, not nearly whole or "effectively whole" as Tithonus Partners advocates.

"Wholly owned" is not defined by the Policy, so the Court must interpret what the term means in the context of the Policy. Pennsylvania law on interpreting insurance contracts provides:

> In interpreting an insurance policy, a court must ascertain the intent of the parties as manifested by the language of the written agreement. When the policy language is clear and unambiguous, the court must give effect to the langue of the contract. However, if the policy provision is ambiguous, the policy provision must be construed in favor of the insured and against the insurer as the drafter of the instrument. Also, ***the words of the insurance policy must be construed in their natural, plain and ordinary sense***.

*Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997) (internal citations omitted) (emphasis added). Moreover, "[i]f the terms of a policy are clear, [the] Court cannot rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used." *Treesdale, Inc. v. TIG Ins. Co.*, 681 F. Supp. 2d 611, 616-17 (W.D. Pa. 2009) (quoting *Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. 2007)).

"[A] contract will be found ambiguous only if it is: (1) reasonably or fairly susceptible of different constructions; (2) capable of being understood in more than one sense; (3) obscure in meaning through indefiniteness of expression; or (4) its words have a double meaning." *Id.* at

617 (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001)).

Further:

> A contract is not ambiguous if the court can determine its meaning absent a guide other than "knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." "[A]mbiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of its terms." In determining whether or not there is an ambiguity, "the whole contract must be considered and not an isolated part."

*Id.* (internal citations omitted).

The Court holds that the term "wholly owned" as used in § 1(d)(i)(D)(2) is clear and unambiguous. It is not readily susceptible to different constructions. Nor is it capable of being understood in more than one sense. It is not obscure in meaning through indefiniteness of expression and, finally, its words do not have a double meaning. Although Tithonus Partners argues that it is impossible for a limited partnership to be wholly owned, this was not specifically couched, nor does the Court construe it, as an argument that the term "wholly owned" is ambiguous. Ambiguity must emanate from the contractual language itself, not from any party's perception or interpretation of those terms. The Court cannot read into "wholly owned" an ambiguity that is not present. The term is not ambiguous.

The Court must afford the terms of § 1(d)(i)(D)(2) their natural, plain and ordinary meaning at the time of the execution of the contract. Black's Law Dictionary[6] defined "wholly" as "[n]ot partially; fully; completely." *Wholly*, BLACK'S LAW DICTIONARY 1735 (9th ed. 2009). The Random House Dictionary similarly defined "wholly" as "entirely; totally; altogether" and

---

[6] The Court reviewed dictionaries that were contemporaneous with the execution of the contract in 2012. *See Madison Constr. Co.*, 735 A.2d at 108 ("Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and we may inform our understanding of these terms by considering their dictionary definitions.").

15

"to the whole amount, extent." *Wholly*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2171 (2d ed. 1987). Finally, Webster's Third defined the term as "to the full or entire extent" and "to the exclusion of other things." *Wholly*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2612 (3d ed. 1993). Here, the record shows that, at the time of the conveyance, Tithonus Partners owned 99.9% of Tithonus Tyrone. The Court therefore cannot find that it "wholly owned" Tithonus Tyrone. To do so would be to expand the plain meaning of "wholly owned" to—as advocated by Tithonus Partners—"*effectively* wholly owned." But that is not what the Policy says, and the Court does not have the authority to amend and broaden the terms of the parties' agreement.

Tithonus Partners cites to *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1133 (3d Cir. 1995), as a purported example of a case where the Third Circuit has held that a rule governing "wholly owned" subsidiaries may apply where the ownership is substantial, but less than 100%. *Siegel* arose in the antitrust context and addressed whether the rule that a parent company cannot conspire with its wholly-owned subsidiary—enunciated by the Supreme Court in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)—also applied when the parent does not quite own 100% of the subsidiary. *Siegel* cannot be read for the broad proposition that somewhat less than 100% may be construed as "wholly owned" in all cases and for all purposes. Rather, it must be construed and constrained by the context in which it arose - antitrust law. The *Copperweld* decision addressed the "fundamental question . . . [of] whether an agreement between a parent and its wholly owned subsidiary represents the conduct of one economic actor or two." *Siegel*, 54 F.3d at 1132. The rule that a parent and "wholly owned" subsidiary cannot conspire with one another for antitrust purposes recognizes that "given the control a parent wields over its wholly owned subsidiary, these parties always share 'a unity of

16

purpose or a common design,' and thus, cannot engage in Section 1 [of the Sherman Antitrust Act] concerted activity." *Id.* (citing *Copperweld*, 467 U.S. at 771-72). Because the focus of the *Copperweld* decision was market impact, it was not a far stretch to extend this rule to situations where a parent did not own a complete majority of the subsidiary. The effect on markets of concerted action is essentially the same. This market-based rule reflects the purpose of antitrust law, the effect of companies' collaboration on markets. It cannot be read as a blanket redefinition of the term "wholly owned" to be something less. The Third Circuit simply did not hold that, as a general matter, "wholly owned" as used in contracts and other contexts really means "effectively wholly owned" or some other looser measure.

The Court holds that it must afford the term "wholly owned" used in § 1(d)(i)(D) its ordinary and natural construction. "Wholly" means completely and entirely in an absolute and objective sense.[7] Tithonus Partners did not wholly own Tithonus Tyrone. It is not, therefore, an

---

[7] Tithonus Partners offers a final counterpoint, asserting that "Chicago Title cannot reasonably seek to enforce a 100% 'wholly owned' exclusion" because it is "legal[ly] and factual[ly] impossib[le]" for any entity to own 100% of Tithonus Tyrone, a Pennsylvania limited partnership. (ECF No. 29, p. 18). Tithonus Partners cites *Daburlos v. Commercial Insurance Co. of Newark, New Jersey*, 381 F. Supp. 393, 400 (E.D. Pa. 1974), for the proposition that "conditions which are impossible of performance are ineffectual and void." That case concerned a policy condition that made it "impossible for the insureds, within the literal terms of [the contract], to modify their insurance [coverage]," thereby depriving them of an express "contractual right purchased by the payment of the premium." *Id.* at 402. The court thus "disregarded" the impossible condition and held that the insureds' beneficiary, having satisfied the other conditions of coverage, had a right to collect under the policy. *Id.* at 397, 401. The purportedly impossible condition in this case, however, is of a different sort. The "wholly owned" subclause—part of a generic definition section—does not have any effect whatsoever on the coverage rights of the named Insured (Tithonus Tyrone). Nor does it operate as the sole method for third parties (like Tithonus Partners) to seek coverage rights as successors to the named Insured. Thus, while affording "wholly owned" its plain meaning may render it inapplicable in most, if not all cases, it would not cause an outright deprivation of rights at the heart of the contract, as occurred in *Daburlos*. Accordingly, the Court will not "disregard[ ]" the "wholly owned" requirement. *Id.* at 401. And the Court cannot "rewrit[e]" the contract or interpret it to require something less than whole ownership, which would not be a "reasonable interpretation" of unambiguous policy language. *Id.*

"Insured" under Section 1 of the Policy. Because it is not an "Insured," coverage is not owed. As such, the Court must enter judgment in favor of Chicago Title and against Tithonus Partners on the breach of contract claim.[8]

### B. COUNT II – INSURANCE BAD FAITH PURSUANT TO 42 PA. C.S. § 8371

A claim for statutory bad faith under 42 Pa. C.S. § 8371 requires that "the insurer has acted in bad faith toward the insured." As explained above, Tithonus Partners was not an "Insured" under the Policy. Because Tithonus Partners was not an "Insured" it cannot maintain a bad faith claim against Chicago Title. *See Seasor v. Liberty Mut. Ins. Co.*, 941 F. Supp. 488, 491 (E.D. Pa. 1996) ("[I]n order to bring an action for bad faith against an insurer, one must qualify as an "insured" as that term is defined in the policy."). Accordingly, summary judgment will be entered in favor of Chicago Title as to Count II.

### IV. CONCLUSION

For the foregoing reasons of law and fact, the Court will grant Chicago Title's summary judgment motion (ECF No. 27) and enter judgment in its favor as to Counts I and II. Orders of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

10-8-2021
Date

---

[8] Because, as a threshold matter, Tithonus Partners is not entitled to coverage as an "Insured" under Section 1 of the Policy, the Court need not address the parties' arguments under Section 2.